CITIES SERVICE CO. ET AL. *v.* McGRATH, ATTORNEY GENERAL, SUCCESSOR TO THE ALIEN PROPERTY CUSTODIAN.

No. 305.   Argued January 2–3, 1952.—Decided January 28, 1952.

*Timothy N. Pfeiffer* argued the cause for petitioners and was on the brief for the Chase National Bank. With him also on the brief were *Theodore N. Johnsen,* for the Cities Service Company, and *Rebecca M. Cutler,* of counsel.

*George B. Searls* argued the cause for respondent. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Baynton, James D. Hill* and *Irwin A. Seibel.*

Mr. Justice Clark delivered the opinion of the Court.

In this suit the Attorney General of the United States as successor to the Alien Property Custodian [1] seeks payment by petitioners of two 5% gold debentures of the face value of $1,000 each and payable to bearer. Petitioner Cities Service Company is obligor on the debentures and petitioner Chase National Bank of New York is the indenture trustee. The obligations represented by these debentures had previously been vested, under provisions of the Trading with the Enemy Act,[2] upon a finding that the obligations were owned by a resident and national of Germany.[3] Neither of the debentures is or ever has been in the possession of respondent. One of the debentures, although not maturing until 1969, was presented for redemption at Chase's offices in New York City on January 5, 1950, subsequent to the date of the vesting order. A

---

[1] The powers and functions of the Alien Property Custodian were transferred to the Attorney General by Exec. Order No. 9788 (Oct. 14, 1946), 11 Fed. Reg. 11981. The terms "Custodian" and "Attorney General" are used interchangeably in this opinion.

[2] 40 Stat. 411, as amended, 50 U. S. C. App. § 1 *et seq.*

[3] Vesting Order No. 12960 (March 11, 1949), 14 Fed. Reg. 1405. The vesting order recited that the obligations were "owned or controlled by, payable or deliverable to, held on behalf of or on account of, or owing to, or [were] evidence of ownership or control by," the specified resident and national of Germany.

legend was then typed on the debenture reciting the issuance of the vesting order and the claims of respondent thereunder. This debenture is at present in the possession of a brokerage house in New York City.[4] The other debenture matured in 1950 but has never been presented for payment. Its whereabouts are unknown but it was last reported to be in Berlin in the hands of the Russians.[5]

The District Court granted summary judgment for petitioners on the ground that the Attorney General, in issuing the vesting order in question, had exceeded his authority to vest property "within the United States."[6] 93 F. Supp. 408. The Court felt that the obligations represented by the debentures were inseparable from the certificates themselves, which, insofar as is known, were outside this country at the time of vesting. The Court of Appeals reversed and directed summary judgment for respondent, holding that the Act authorized the seizure and enforcement of obligations evidenced by debentures

---

[4] With respect to this debenture, the Attorney General seeks payment by petitioners of the proceeds of redemption plus accrued interest; or, in the alternative, the issuance to him of a new debenture of the same series and for the same face value, and with the same number of unpaid interest coupons attached.

[5] With respect to this debenture, the Attorney General seeks payment of the redemption proceeds plus accrued interest.

[6] By § 2 (c) of Exec. Order No. 9095 (March 11, 1942), 7 Fed. Reg. 1971, as amended by Exec. Order No. 9193 (July 6, 1942), 7 Fed. Reg. 5205, and Exec. Order No. 9567 (June 8, 1945), 10 Fed. Reg. 6917, the President, acting pursuant to the Trading with the Enemy Act, as amended, delegated to the Attorney General authority to vest property "within the United States" owned by a designated enemy country or national thereof, with specified exceptions not relevant here. Assuming, without deciding, that this language is narrower than the language of §§ 5 (b) and 7 (c) of the Act, as amended, we need not decide which language is controlling. For, as indicated below, we believe that in any event the obligations vested here were "within the United States" and thus come within the presumably narrower terms of the Executive Order.

outside the country so long as the obligor is within the United States. 189 F. 2d 744. In reaching this result, the Court of Appeals indicated that petitioners would have a "claim against the Treasury for recoupment" in the event of a subsequent recovery against them in a foreign court by a bona fide holder of the debentures. Otherwise, the Court felt, the vesting order would take petitioners' property in violation of the Fifth Amendment. *Id.*, at 747–749. We granted certiorari, 342 U. S. 865.

We believe that the Trading with the Enemy Act grants the authority necessary to vest obligations evidenced by domestic negotiable bearer debentures even though the debentures themselves are outside the United States. By § 7 (c) of the Act, enacted during World War I, the President is given the authority to seize all enemy property, "including . . . choses in action, and rights and claims of every character and description owing or belonging to . . . an enemy . . . ." At the beginning of World War II, Congress made an even broader grant of authority to the Executive through an amendment to § 5 (b), providing that "any property or interest of any foreign country or national thereof shall vest, when, as, and upon the terms, directed by the President . . . ." See *Markham* v. *Cabell,* 326 U. S. 404, 411 (1945); *Silesian-American Corp.* v. *Clark,* 332 U. S. 469, 479 (1947); *Clark* v. *Ueber-see Finanz-Korp.,* 332 U. S. 480, 485–486 (1947). That the obligations represented by negotiable bearer debentures come within these broad terms is beyond question.

Petitioners urge, however, that the debentures themselves constitute the debt, and since the debentures were located outside of the United States at the time of vesting, the debts did not have a situs within the United States and therefore were not proper subjects of seizure. To apply this fiction here would not only provide a sanctuary for enemy investments and defeat the recovery of American securities looted by conquering forces; it would also

restrict the exercise of the war powers of the United States. Congress did not so intend. The Custodian's authority to reach a debenture or bonded indebtedness without seizure of the instrument itself is explicitly recognized by § 9 (n) of the Act, which provides that "[i]n the case of property consisting . . . of bonded or other indebtedness . . ., evidenced . . . by bonds or by other certificates of interest . . . or indebtedness . . ., where the right, title, and interest in the property (but not the actual . . . bond or other certificate of interest or indebtedness) was conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian, or seized by him . . .," then the President may, in proper cases, order return of 80% of the property.[7] Moreover, in giving the Custodian this power to seize an interest represented by a bond or debenture without seizure of the actual instrument, Congress transgressed no constitutional limitations on its jurisdiction. As the Court of Appeals pointed out, the obligor, Cities Service Company, is within the United States and the obligation of which the debenture is evidence can be effectively dealt with through the exercise of jurisdiction over that petitioner. See *Standard Oil Co.* v. *New Jersey,* 341 U. S. 428, 438–439 (1951).

A more serious question is whether application of the seizure provisions of the Act to petitioners will take their property in violation of the Fifth Amendment, unless they have a remedy against the United States in the event a foreign court holds them liable to a holder in due course

---

[7] Section 9 (n) was added in 1928 by the Settlement of War Claims Act, 45 Stat. 254, which provided in general for the return of 80% of all seized property. The purpose of § 9 (n) was to authorize the President, where he had seized a stock or bond interest without seizing the instrument itself, to make such 80% return to the current holder of the instrument. See H. R. Rep. No. 17, 70th Cong., 1st Sess. 21; S. Rep. No. 273, 70th Cong., 1st Sess. 30.

of the debentures. While petitioners concede that the Act discharges them from liability in any court in the United States,[8] they contend that they have extensive properties over the world which subject them to foreign -suits from which the Act affords no certain protection. Petitioners readily admit that the court of the country in which suit is brought may apply the laws of the United States and recognize their prior payment to the Attorney General as a complete defense; and that the holder, if qualified, might file a claim under the Act. Nevertheless, they insist, there remains at least the possibility that they will be exposed to liability in a foreign court. While their defense to such litigation seems adequate and final payment by them improbable, we agree that petitioners might suffer judgment the payment of which would effect a double recovery against them. In that event, petitioners will have the right to recoup from the United States, for a "taking" of their property within the meaning of the Fifth Amendment, "just compensation" to the extent of their double liability.[9] Such cause of action will accrue when, as, and if a foreign court forces petitioners to pay a holder in due course of the debentures. We agree with

---

[8] See §§ 5 (b) (2) and 7 (e).

[9] Such recovery will not be prevented by § 7 (c) of the Act. That subsection provides in part:

"The sole relief and remedy of any person having any claim to any money or other property heretofore or hereafter conveyed, transferred, assigned, delivered, or paid over to the Alien Property Custodian, or required so to be, or seized by him shall be that provided by the terms of this Act . . . ."

Petitioners, however, will not be claiming "any money or other property . . . conveyed, transferred, assigned, delivered, or paid over to the Alien Property Custodian, or required so to be, or seized by him . . . ." Rather they will be claiming just compensation under the Fifth Amendment for a taking of their property. Therefore the provision quoted above will not apply to them.

the Court of Appeals that only with this assurance against double liability can it fairly be said that the present seizure is not itself an unconstitutional taking of petitioners' property.

*Affirmed.*

MR. JUSTICE REED, with whom MR. JUSTICE MINTON joins, concurring.

We concur in the result and in the opinion except as to its declaration that petitioners will be able to recoup just compensation from the United States should they suffer a judgment effecting a second recovery against them.

In our view there is no present taking of the property of Cities Service, but only of the money due from Cities Service to the foreign bondholder on maturity of the obligation. *Standard Oil Co.* v. *New Jersey,* 341 U. S. 428. It may be that if Cities Service is later required to pay a claimant other than the Alien Property Custodian, it will have a claim against the United States for satisfaction of its expenditure. Determination that the United States owes such an obligation should await development of the circumstances of a second judgment. *Directior Der Disconto-Gesellschaft* v. *U. S. Steel Corp.,* 300 F. 741, 743; 267 U. S. 22, 29.