[No. A031735. First Dist., Div. Two. Feb. 14, 1986.]

CROWN OIL CORPORATION et al., Petitioners, v.
THE SUPERIOR COURT FOR THE CITY AND COUNTY OF
SAN FRANCISCO, Respondent;
LAPIDUS POPCORN, INC., Real Party in Interest.

**COUNSEL**

Pillsbury, Madison & Sutro, James F. Kirkham, Walter R. Allan, Debra B. Keil, Baker & McKenzie, Juan G. Collas, Jr., Bruce H. Jackson and Jonathan S. Kitchen for Petitioners.

No appearance for Respondent.

Scarpulla & Scarpulla, Francis O. Scarpulla, Stephen V. Scarpulla, Mario N. Alioto and Joseph M. Patane for Real Party in Interest.

John K. Van de Kamp, Attorney General, Andrea Sheridan Ordin, Chief Assistant Attorney General, Stanford N. Gruskin, Assistant Attorney General, Michael I. Spiegel, Patricia Cutler and Charles M. Kagay, Deputy Attorneys General, for Amicus Curiae.

**OPINION**

**ROUSE, J.**—Petitioners Crown Oil Corporation, Granex Corporation, U.S.A., and Pan Pacific Commodities (hereafter defendants) seek review of the trial court's order overruling their demurrer to a complaint filed by real party in interest Lapidus Popcorn, Inc. (hereafter plaintiff) on behalf of a class of indirect purchasers of coconut oil from defendants. Initially, this court denied the petition without opinion, after which the California Supreme Court directed us to issue an alternative writ with respect to the petition.

Plaintiff filed suit against defendants alleging violations of California's Cartwright Antitrust Act (Cartwright Act) and Unfair Practices Act. (Bus.

& Prof. Code, §§ 16700 et seq., 17000 et seq.)[1] The action was brought on behalf of a class of California businesses which purchased coconut oil indirectly from defendants. Specifically alleging violations of sections 16720 and 17200, the complaint prayed for treble damages in accordance with section 16750, subdivision (a).

Defendants demurred to the complaint on the grounds, inter alia, that the 1978 amendment to the Cartwright Act (Stats. 1978, ch. 536, § 1, p. 1693), to the extent that it authorizes indirect purchasers to sue for treble damages for price-fixing overcharges, is in conflict with and frustrates federal law which prohibits such indirect purchaser recovery. Accordingly, defendants maintained that the amendment is preempted by federal law under the Supremacy Clause. (U.S. Const., art. VI, cl. 2.)[2]

The trial court overruled the demurrer, finding "1. The State law does not conflict with the federal law; [¶] 2. Congress has not expressed, by unambiguous language, an intention to preempt; and [¶] 3. The State law does not stand as an obstacle to the accomplishment of the full purposes and objectives of the Clayton Act." We agree with the trial court's ruling, and, thus, we deny the peremptory writ.

## I. *Background*

In 1890, the United States Congress enacted the Sherman Act (15 U.S.C. §§ 1-7) which prohibits trade restraints and monopolistic practices that affect interstate and/or foreign commerce. Thereafter, in 1914, Congress passed section 4 of the Clayton Act (15 U.S.C. § 15) and created a private right of action for persons injured by antitrust violations. The California Legislature codified this state's common law against trade restraints by enacting the Cartwright Act in 1941. (§ 16700 et seq.) The Cartwright Act provided a private right of action to any person "injured in his business or property." Thus, for more than 40 years both federal and state law have provided protection for persons injured by antitrust violations.

---

[1]All statutory references are to the Business and Professions Code unless otherwise indicated.

[2]In their points and authorities in support of the demurrer, defendants stated that several complaints, alleging the identical wrongdoing, had been filed in federal district courts on behalf of all direct purchasers of coconut oil against the same named defendants. These federal actions, brought pursuant to sections 1 and 2 of the Sherman Antitrust Act (Sherman Act) (15 U.S.C. §§ 1, 2) and sections 4 and 16 of the Clayton Antitrust Act (Clayton Act) (15 U.S.C. §§ 15, 26), were subsequently consolidated and transferred to the United States District Court for the Northern District of California. (In re Coconut Oil Antitrust Litigation MDL 474.) On July 1, 1983, an agreed final judgment was entered in the federal action in accordance with a settlement agreement. The settlement terms included an agreement by defendants to pay the plaintiffs $2 million in cash and to distribute to the plaintiffs class coupons evidencing credits for 40,241,448 pounds of crude and refined coconut oil which were valued for settlement purposes at $10 million.

In 1968, the United States Supreme Court was called upon to resolve a conflict in the United States circuit courts as to whether an antitrust defendant could raise a "pass-on" defense. In *Hanover Shoe* v. *United Shoe Mach.* (1968) 392 U.S. 481 [20 L.Ed.2d 1231, 88 S.Ct. 2224], the plaintiff, a shoe manufacturer, sued the defendant shoe machinery manufacturer, claiming that the defendant's practice of leasing rather than selling its machinery had monopolized the shoe machinery industry in violation of section 2 of the Sherman Act. The plaintiff alleged injury to his business resulting from the leasing practice, because its costs were higher than they would have been if the defendant had been willing to sell the machinery outright. The defendant asserted a "pass-on" defense, alleging that the plaintiff was not injured by the overcharge because it was passed on to its customers further down the chain of distribution in the form of higher prices.

The Supreme Court rejected this defense and held that "when a buyer shows that the price paid by him for materials purchased for use in his business is illegally high and also shows the amount of the overcharge, he has made out a prima facie case of injury and damage within the meaning of § 4." (*Hanover Shoe* v. *United Shoe Mach.*, supra, 392 U.S. 481, 489 [20 L.Ed.2d 1231, 1239].) The court reasoned that there would be insurmountable difficulties in tracing the overcharge through the chain of distribution and the ultimate consumers would have little interest in bringing a class action because of the insignificant monetary injuries they sustained. The court concluded that if direct purchasers were not allowed to sue for the portion of the overcharge passed on to indirect purchasers, antitrust violators would profit by their illegal acts since nobody would bring suit against them. (*Id.*, at pp. 492-494 [20 L.Ed.2d at pp. 1241-1242].) Although *Hanover Shoe* prohibited the defensive use of the "pass-on" doctrine, it left unanswered the question of whether the "pass-on" theory could be used offensively by indirect consumers.

This question was answered in the negative in *Illinois Brick Co.* v. *Illinois* (1977) 431 U.S. 720 [52 L.Ed.2d 707, 97 S.Ct. 2061]. The plaintiffs in *Illinois Brick,* the State of Illinois and 700 local governmental entities, filed suit against the defendant concrete block manufacturers, charging a price-fixing conspiracy in violation of section 1 of the Sherman Act. The defendants allegedly fixed the price of concrete blocks which they sold to masonry contractors. The masonry contractors, acting as subcontractors for the masonry portions of construction projects, in turn sold to general contractors. The general contractors finally sold the buildings to the plaintiffs. The defendants moved for partial summary judgment against all of the plaintiffs that were indirect purchasers of concrete block, contending that as a matter of law only direct purchasers could sue for the alleged overcharge.

The Supreme Court agreed. Seeking symmetry with its holding in *Hanover Shoe,* the court stated that "whatever rule is to be adopted regarding pass-on in antitrust damages actions, it must apply equally to plaintiffs and defendants." (*Illinois Brick Co.* v. *Illinois, supra,* 431 U.S. 720, 728 [52 L.Ed.2d 707, 714].) The court stated two reasons for its decision. First, allowing offensive but not defensive use of the "pass-on" doctrine would create a substantial risk of multiple liability for defendants. (*Id.,* at p. 730 [52 L.Ed.2d at p. 715].) Second, "the evidentiary complexities and uncertainties involved in the defensive use of pass-on against a direct purchaser are multiplied in the offensive use of pass-on by a plaintiff several steps removed from the defendant in the chain of distribution." (*Id.,* at p. 732 [52 L.Ed.2d at p. 717].)

In California, reaction to the *Illinois Brick* decision was immediate. In 1978, the California Legislature added the following paragraph to section 16750, subdivision (a): "Such action may be brought by any person who is injured in his business or property by reason of anything forbidden or declared unlawful by this chapter, *regardless of whether such injured person dealt directly or indirectly with the defendant.*" (Italics added.)[3] As the California Supreme Court subsequently observed, "California's 1978 amendment to section 16750 in effect incorporates into the Cartwright Act the view of the dissenting opinion in *Illinois Brick*[4] [citation] that indirect purchasers are persons 'injured' by illegal overcharges passed on to them in the chain of distribution." (*Union Carbide Corp.* v. *Superior Court* (1984) 36 Cal.3d 15, 20 [201 Cal.Rptr. 580, 679 P.2d 14].)

It is against this backdrop that we consider defendants' contention that the 1978 amendment to the Cartwright Act is preempted by federal law.

---

[3]A similar response occurred in other jurisdictions. (See, e.g., Hawaii Rev. Stats., § 480-14(c); Ill. Ann. Stats., ch. 38, § 60-7(2) (Smith Hurd 1977); N.M. Stats. Ann., § 57-1-3(A); Wis. Stats. Ann., § 133.18(1); D.C. Code Ann. § 28-45091; Md. Ann. Code, § 11-209; S.D. Laws Ann. § 7-1-33.) Alabama and Mississippi already had statutes allowing indirect-purchaser recovery. (See Ala. Code, § 6-5-60(a); Miss. Code Ann., § 75-21-9.)

[4]The dissent viewed the majority opinion as a regrettable retreat from prior cases which extended recovery to all persons who are made victims of the forbidden practice. (See *Mandeville Farms* v. *Sugar Co.* (1948) 334 U.S. 219, 236 [92 L.Ed. 1328, 1340, 68 S.Ct. 996].) Justice Brennan declared that the decision frustrated Congress' plainly stated objective to provide a remedy to all persons injured by violations of the antitrust laws. The dissent draws attention to the then recently enacted Hart-Scott-Rodino Antitrust Improvements Act of 1976 (15 U.S.C. § 15c et seq.) which gave state Attorneys General a cause of action to sue as *parens patraie* on behalf of citizens against antitrust violators and reasoned that the act confirmed Congress' intent to provide redress to all injured persons. (*Illinois Brick Co.* v. *Illinois, supra,* 431 U.S. 720, 748-765 [52 L.Ed.2d 707, 726-736].) In a separate dissenting opinion, Justice Blackmun stated that had *Hanover Shoe* not been " 'on the books,' " he was positive that possibly a unanimous court would have ruled in favor of the plaintiffs. (*Id.,* at p. 765 [52 L.Ed.2d at p. 737].)

## II. *Preemption*

■ "It is well established that within constitutional limits Congress may pre-empt state authority by so stating in express terms. [Citation.] Absent explicit pre-emptive language, Congress' intent to supersede state law altogether may be found from a ' "scheme of federal regulation . . . so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," : . .' [Citations.] Even where Congress has not entirely displaced state regulation in a specific area, state law is preempted to the extent that it actually conflicts with federal law. Such a conflict arises when 'compliance with both federal and state regulations is a physical impossibility,' [citation], or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' [Citation.]" (*Pacific Gas & Elec.* v. *Energy Resources Comm'n* (1983) 461 U.S. 190, 203-204 [75 L.Ed.2d 752, 765, 103 S.Ct. 1713]; see also *Silkwood* v. *Kerr-McGee Corp.* (1984) 464 U.S. 238, 248 [78 L.Ed.2d 443, 452, 104 S.Ct. 615, 621].)

Defendants concede that Congress has not completely displaced state regulation in the area of antitrust. (See *R.E. Spriggs Co.* v. *Adolph Coors Co.* (1974) 37 Cal.App.3d 653, 660 [112 Cal.Rptr. 585].) However, they contend that a specific provision of state law may nonetheless be preempted where, as here, it stands in square opposition to the federal rule that indirect purchasers may not claim price-fixed overcharges.

Defendants' first and strongest argument in favor of preemption is that California law permits multiple liability. They reason that damages caused by antitrust violations result in a "single overcharge" which is placed in a "common fund." (See *Blue Shield of Virginia* v. *McCready* (1982) 457 U.S. 465, 474 [73 L.Ed.2d 149, 157, 102 S.Ct. 2540]; *Illinois Brick Co.* v. *Illinois, supra,* 431 U.S. 720, 737 [52 L.Ed.2d 707, 719].) They claim that if recovery from the common fund is limited to direct purchasers under federal law, a second fund for indirect consumers created by state law creates the risk of duplicative recoveries, a practice frowned upon by the *Illinois Brick* court. (*Id.,* at p. 731, fn. 11 [52 L.Ed.2d at p. 716].) While this court, like the United States Supreme Court, is troubled by the threat of multiple liability, we find defendants' argument unpersuasive with respect to the issue of preemption.

■ Preliminarily, we note that where, as in the case of antitrust regulation, Congress has not expressed its intent to preempt state authority, the proper approach to a preemption analysis is to reconcile "the operation of both statutory schemes with one another rather than holding one completely ousted." (*Silver* v. *New York Stock Exchange* (1963) 373 U.S. 341, 357 [10

L.Ed.2d 389, 400, 83 S.Ct. 1246]; see also *Merrill Lynch, Pierce, Fenner & Smith* v. *Ware* (1973) 414 U.S. 117, 127 [38 L.Ed.2d 348, 359, 94 S.Ct. 383].)

In the present case there is no conflict between the federal and state statutes concerning conduct. ▇ "Both the Sherman Act and the Cartwright Act proscribe price fixing—the standard for lawful competitive conduct is identical under both state and federal law." (*Alton Box Bd. Co.* v. *Esprit de Corp.* (9th Cir. 1982) 682 F.2d 1267, 1274, fn. 11.) In addition, there is no discrepancy between the federal and state schemes with regard to certain remedies. The *Illinois Brick* court left open the possibility of recovery for some indirect consumers where direct purchasers used a "cost-plus" pricing schedule or were owned or controlled by the customer. (*Illinois Brick Co.* v. *Illinois, supra,* 431 U.S. 720, 735-736 & fn. 16 [52 L.Ed.2d 707, 718-719].) Also, federal case law has held that indirect purchasers may obtain injunctive relief pursuant to section 16 of the Clayton Act even if monetary relief is generally unavailable. (*In re Beef Industry Antitrust Litigation* (5th Cir. 1979) 600 F.2d 1148, 1167; *Mid-West Paper Products Co.* v. *Continental Group* (3d Cir. 1979) 596 F.2d 573, 589-594.) Thus, a potential conflict arises only when we compare federal and state remedies with respect to damages.

It has long been established that " 'the same act might, as to its character and tendencies, and the consequences it involved, constitute an offence against both the State and Federal governments, and might draw to its commission the penalties denounced by either, as appropriate to its character in reference to each.' " (*California* v. *Zook* (1949) 336 U.S. 725, 731 [93 L.Ed. 1005, 1010, 69 S.Ct. 841], citing *United States* v. *Marigold* (1850) 50 U.S. 560, 569 [13 L.Ed. 257, 261].) The United States Supreme Court has recently confirmed the same principle.

In *Silkwood* v. *Kerr-McGee Corp., supra,* 464 U.S. 238 [78 L.Ed.2d 443, 104 S.Ct. 615], the United States Supreme Court rejected the argument that the Nuclear Regulatory Commission's (NRC) exclusive authority to regulate nuclear safety and provide penalties preempted state punitive recovery under state tort law. "The United States, as amicus curiae, contends that the award of punitive damages in this case is preempted because it conflicts with the federal remedial scheme, noting that the NRC is authorized to impose civil penalties on licensees when federal standards have been violated. 42 U.S.C. § 2282 (1976 ed. and supp. V). However, the award of punitive damages in the present case does not conflict with that scheme. Paying both federal fines and state-imposed punitive damages for the same incident would not appear to be physically impossible. Nor does exposure

to punitive damages frustrate any purpose of the federal remedial scheme." (*Id.*, at p. 626].)

Similarly, in *Hayfield Northern R.* v. *Chicago & N.W. Transp.* (1984) 467 U.S. 622 [81 L.Ed.2d 527, 104 S.Ct. 2610], the high court upheld a Minnesota condemnation statute which purportedly was preempted by the Staggers Rail Act of 1980. (49 U.S.C. §§ 10903-10906.) In response to the argument that the state statute allowed shippers to relitigate the price the Interstate Commerce Commission had established for the purchase or subsidizing of railroad lines, the court stated that "although it may seem unfair to allow a shipper a 'second bite at the apple' in state condemnation proceedings after it has participated in . . . negotiations under [federal statute], that second opportunity does not frustrate the purpose of the federal valuation scheme." (*Id.*, at p. 636 [81 L.Ed.2d at p. 539, 104 S.Ct. at p. 2619].)

**(2b)** In the present situation we see no way that California's remedy for antitrust violations conflicts with the federal remedy. The fact that the injured indirect purchasers may recover under state law does not obstruct the federal scheme which only permits recovery by direct purchasers.[5] As the California Supreme Court has stated, "Questions of whether overcharges were passed on, essential to the indirect purchaser's California claim, are irrelevant to, and thus not subject to inconsistent determination in, a suit on the direct purchaser's federal claim." (*Union Carbide Corp.* v. *Superior Court, supra,* 36 Cal.3d 15, 23.) Thus, it cannot be asserted that section 16750 either conflicts with federal law or stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. The statute comports with Congress' express intent to provide a remedy to "*any* person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." (See 15 U.S.C. § 15.) Indeed, we agree, as did our state's Legislature, with Justice Brennan's observation that it is the *Illinois Brick* majority decision which frustrates Congress' purpose in creating the treble-damages action. (*Illinois Brick Co.* v. *Illinois, supra,* 431 U.S. 720, 754-756 [52 L.Ed.2d 707, 730-731].) In any event, we do not view the judicially economic rationale set forth in *Hanover Shoe* and *Illinois Brick* as constituting an adequate basis for a preemption argument.[6]

---

[5]If, for example, the state statute required that all overcharges be paid to indirect consumers, but not direct consumers, there would be a conflict with the federal remedy. However, in the present case, the California statute in no way impinges on recovery of damages by direct purchasers.

[6]A similar conclusion was reached in *State Indirect Purchaser Statutes: The Preemptive Power of Illinois Brick* (1982) 62 B. U. L. Rev. 1241. That note sets forth an excellent analysis of whether state statutes that authorize indirect purchaser suits so conflict with the federal policies expressed in *Illinois Brick* as to require preemption of the state statutes. The

### III. *Due Process*

Relying on *Western Union Co.* v. *Pennsylvania* (1961) 368 U.S. 71 [7 L.Ed.2d 139, 82 S.Ct. 199], *Cities Service Co.* v. *McGrath* (1952) 342 U.S. 330 [96 L.Ed. 359, 72 S.Ct. 334], and *Boutte* v. *Chevron Oil Company* (E.D.La. 1970) 316 F.Supp. 524, defendants also contend that section 16750, by giving claims to indirect purchasers for price-fixed overcharges, violates due process.[7] The contention rests on the assumption that antitrust overcharges and penalties result in one common fund; if that common fund is distributed to direct purchasers in federal actions, a subsequent award to indirect consumers in state actions raises the specter of double recovery.

We need not here discuss the possibility that there may be both a federal common fund and a state common fund, or whether a federal award may be used to offset a state award. The potential for multiple liability in the present case is sheer speculation.

First, as both the *Illinois Brick* court and our own Supreme Court have pointed out, " 'there is a greater *hypothetical* danger of multiple recovery where suits are independently instituted after an earlier suit based on the same violation has proceeded to judgment.' " (*Union Carbide Corp.* v. *Superior Court, supra,* 431 U.S. 720, 763 [52 L.Ed.2d 707, 736], italics added.) In this case, although an agreed final judgment was entered pursuant to a settlement agreement,[8] no liability under the Sherman Act was admitted and, certainly, the issue of damages was never adjudicated. Thus, there is no indication of the actual damages in the federal action, which would form the basis for a charge of multiple liability.

Second, there is nothing to show at this pleading stage of the proceedings that a duplicative recovery will occur. We are merely called upon to review whether plaintiff has stated a cause of action. It is not the function of this court to give advisory opinions on how to avoid a potential multiple recovery. We, as others, are confident that when the threat of double recovery occurs, the trial court will fashion relief accordingly. (See *Illinois Brick Co.* v. *Illinois, supra,* 431 U.S. 720, 761-762 [52 L.Ed.2d 707, 734-735].)

author reasons that since the legislative history of the federal antitrust law, and the case law thereunder, do not evidence a *congressional* intent to displace state law and since the *Illinois Brick* decision is based predominantly on the policy of judicial economy, the Supreme Court's reliance on nonstatutory policies dictates that the decision not be extended to displace state laws that allow such suits.

[7]Defendants also cite *Russo & Dubin* v. *Allied Maintenance Corp.* (1978) 95 Misc.2d 344 [407 N.Y.S.2d 617], and *In re Wiring Device Antitrust Litigation* (E.D.N.Y. 1980) 498 F.Supp. 79. However, in both of these antitrust actions no state statute provided for suits by indirect purchasers and the due process argument was never fully discussed.

[8]See footnote 2, *ante.*

The alternative writ is discharged and the petition for writ of mandate is denied.

Kline, P. J., and Smith, J., concurred.

A petition for a rehearing was denied March 13, 1986, and the application of petitioners Granex Corporation and Pan Pacific Commodities for review by the Supreme Court was denied May 22, 1986. Grodin, J., Lucas, J., and Panelli, J., were of the opinion that the application should be granted.